No. 89,759

JERRY RICE, *et al., Appellants*, v. STATE OF KANSAS, *et al.,*
*Appellees.*
(95 P.3d 994)

Opinion filed August 20, 2004.

*Bruce Plenk*, of Law Office of Bruce Plenk, of Lawrence, argued the cause, and *Max Kautsch*, of the same firm, was with him on the briefs for appellants.

*Timothy G. Madden*, of Kansas Department of Corrections, argued the cause, and *Kenneth R. Smith*, special assistant attorney general, was with him on the briefs for appellees.

The opinion of the court was delivered by

NUSS, J.: Petitioners, who are inmates at Lansing Correctional Facility (LCF), challenge the constitutionality of two of respondents' regulations. The first, K.A.R. 44-12-601(q)(1), requires that all inmate purchases of books, newspapers, and periodicals be made through their inmate account. The second, Internal Management Policy and Procedure (IMPP) 11-101, among other things, limits the amount of inmates' monthly spending. The joint effect is to restrict the amount of subscriptions to newspapers and magazines the inmates receive — through monetarily limiting their direct purchases and through completely banning their receipt of gift subscriptions purchased by those outside LCF.

The district court upheld the regulations, finding they were reasonably related to inmate rehabilitation, a valid penological interest of the Kansas Department of Corrections (DOC). In a split decision, the Court of Appeals held that the regulations were unconstitutional. *Rice v. State*, 31 Kan. App. 2d 964, 76 P.3d 1048 (2003).

This court granted the State's petition for review to consider the sole issue of whether these regulations violate petitioners' rights under the First Amendment to the United States Constitution and similar rights under Section 11 of the Kansas Constitution Bill of Rights. We hold that the regulations are reasonably related to valid penological interests of DOC and are therefore constitutional. Accordingly, we reverse the Court of Appeals and affirm the district court.

FACTS:

Petitioners filed a petition in district court pursuant to K.S.A. 60-901 *et seq.*, seeking to enjoin DOC from denying them gift subscriptions to newspapers and magazines. To justify their actions, the respondents DOC, Warden David McKune, and LCF's risk manager William Cummings relied upon K.A.R. 44-12-601 and IMPP 11-101.

K.A.R. 44-12-601 concerns the subject of inmate mail. Subsection (q)(1) provides in relevant part:

"Any inmate may receive books, newspapers, and periodicals, except for those inmates assigned to the reception and diagnostic unit for evaluation purposes. *All books, newspapers, or periodicals shall be purchased through special purchase orders.* Only books, newspapers, or periodicals received directly from a publisher or a vendor shall be accepted." (Emphasis added.)

For an inmate to receive a newspaper or magazine, a copy of DOC's publication form must be completed and a special purchase order (SPO) must be sent to the LCF business office. Funds are then withdrawn from the inmate's LCF account — the only banking account an inmate is allowed to use. The mailroom notes this fact on its database, and then delivers the publication which has been directly mailed by the publisher to LCF in the inmate's name. An inmate who is not on the authorized list of those who have purchased periodicals, but who nevertheless receives a publication, is notified and given 7 days to complete the proper paperwork or else the publication is discarded.

All items purchased for an inmate's use must be purchased through his LCF inmate account. As a result, the requirement of purchasing through SPO's essentially prevents an inmate from re-

ceiving gift subscriptions or publications directly purchased by those outside LCF and then mailed by the publisher to LCF. Moreover, K.A.R. 44-12-601(b) provides that inmates must comply with all mail procedures established by order of the warden and that "circumventing or attempting to circumvent mail procedures or restrictions by any means" is prohibited.

DOC also issues interpretations of and guidance regarding Kansas statutes and regulations in what is known as an Internal Management Policy and Procedure Manual. IMPP 11-101 addresses DOC's "Offender Privileges and Incentives" and was developed pursuant to DOC's stated policy to "implement a comprehensive system of earnable offender privileges, which will provide an effective means of managing the offender population and reinforcing constructive behavioral changes in offenders."

As described by the Court of Appeals, 31 Kan. App. 2d at 966:

"IMPP 11-101 sets forth a comprehensive system of 'Earnable Privileges' and 'Incentive Levels' under which inmates can progress to increasing benefits by avoiding disciplinary actions and criminal behavior and by participating in programs or work assignments. 'Earnable Privileges' include '[u]se of outside funds.'

"Section VI of IMPP 11-101 speaks to 'Limitation[s] on Use of Incoming and Outgoing Funds':

'A. For inmates assigned to Intake Level, outgoing funds shall be limited to fees for legal services, and for inmates on Level I, no outgoing funds may be used to purchase books . . . or . . . newspaper or magazine subscriptions.

'B. Except as provided below, there shall be a $30.00 limit on outgoing funds.
　　1. Inmates may exceed the $30.00 limit, if necessary, for the purchase [of] a primary religious text if the cost of the text is greater than that amount.
　　2. The $30.00 limit shall not apply to payments to the following:
　　　　a. The court for verified restitution and/or court costs;
　　　　b. Verified fees payable to an attorney for legal services;
　　　　c. Verified child support payments;
　　　　d. Specialized fees, expenses as authorized by the warden or designee; and,
　　　　　　(1) As possible, approval for such payments shall be payable to the vendor or service provider only.
　　　　e. Purchases of approved handicraft materials/supplies.

'C. Upon recommendation of the unit team and approval of the warden or designee, offenders assigned to private industry (minimum wage) or those who receive government benefits may be authorized, on an individual basis, to send out funds in excess of $30.00 per pay period limit.

'D. Inmates on Incentive Level II or Incentive Level III are authorized to maintain one (1) newspaper subscription, and may exceed the $30.00 limit for outgoing funds in order to do so.

1. The expense for the newspaper subscription shall be included in the $30.00 limit.

2. Such an exception shall be allowed no more than one (1) time per every three (3)-month period.' "

As noted, the effect of IMPP 11-101(VI), coupled with K.A.R. 44-12-601, is to restrict the amount of subscriptions to newspapers and magazines the inmates receive — through monetarily limiting their direct purchases and through completely banning their receipt of gift subscriptions purchased by those outside LCF.

Inmates are also allowed to receive outside funds, such as a money order, certified check, or a cashier's check, but cannot receive a personal check or cash. There are no restrictions on who the sender of such funds may be or how much money a person may send to an inmate, but as IMPP 11-101(VI) and similar regulations demonstrate, LCF places explicit restrictions on what the inmate may use the funds for and in what amounts. The mailroom sends the funds to the business office, which deposits the funds in the inmate's account.

Margie Phelps, who formerly served as the Deputy Warden of Support Services at LCF, oversaw the mail process for the facility. She issued three DOC interdepartmental memoranda to all inmates regarding the receipt of periodicals. The first memo, dated February 7, 2001, stated in part:

"**Effective March 19, 2001**

*'Periodicals*

'In order to receive a magazine or newspaper,

1. You must purchase the periodical through the Business Office. The mailroom will keep a list from SPO's of all inmates who have made purchases through the Business Office. When you send your SPO to the business office **be certain the name of the periodical is on the SPO.** Otherwise, you will not be on the list of inmates who have purchased periodicals, and your magazine or newspaper will not be processed. **Also, you must complete the attached form and include it with your SPO when purchasing a periodical.**

2. The magazine or newspaper must have a label with your name on it.

'All periodicals received after March 19 that do not comply with these requirements will be sent to the visiting rooms (if appropriate) or destroyed.' "

Phelps testified that she heard from over a hundred inmates in response to her memo and discussed with them the reasoning behind the policy, the past inconsistent enforcement of the policy, and the inmates' rights under the First Amendment.

Phelps' second memo is dated February 20, 2001, and is quoted in the district court's memorandum decision, though it is not part of the record on appeal. It was prepared in response to the inmates' requests and states:

"IMPP 11-101, regarding incentive level system, states:

'Inmates on Incentive Level II or Incentive Level III are authorized to maintain one (1) newspaper subscription, and may exceed the $30.00 limit for outgoing funds in order to do so.

'1. The expense for the newspaper subscriptions shall be included in the $30.00 limit.

'2. Such an exception shall be allowed no more than one (1) time per every three (3) month period.'

"Policy requires that all periodicals be purchased through the business office by an SPO. It does not allow for persons outside the facility to purchase and send in subscriptions to periodicals. If you are on Incentive Level II or III you may exceed the $30 limit once every three months for newspapers only. Beyond this, your periodical purchases must be within the $30 per month limit.

"This means if you are currently receiving subscriptions that you did not pay for through the business office, you need to divert them, because after the effective date stated in the memo those will not be sent in. It also means in the future only those periodicals purchased by SPO, clearly identified as periodicals through the periodical cover sheet and on the SPO, will be processed through the mailroom.

"If you have already purchased a periodical through the business office by SPO, you should already be in the system approved for this item. It is important that you make it clear in your paperwork what periodicals you are ordering. We are going through the records at this time and making a list of those inmates who have periodical purchases on file. All inmates and periodicals on that list will be sent through after the effective date.

"This policy is not new, and has been in place for some time. My recent memo simply clarified what part the mailroom has in enforcing the policy. Also, since it appeared some inmates were not following the policy, we gave reasonable notice of the fact that this needs to be corrected.

"If you are receiving a free religious periodical, so long as it is not coming in by bulk mail, we will continue to process that periodical. Any item that is free and comes in by bulk mail will not be sent in, because departmental policy disallows processing bulk mail items."

Approximately 3 weeks after Phelps' first memo, and 10 days after her second, she distributed her third memo, dated March 2, 2001, which stated in part:

"On 2/7/01 you received a memo indicating that it would be necessary to comply with IMPP 11,101 [*sic*] concerning all periodicals and newspapers.

"Since this memo was issued, we have had dialogue with inmates and unit team staff. From this dialogue it became clear that there is confusion on both sides about how this policy is to be applied.

"Accordingly, to accommodate this uncertainty, the facility is going to permit each inmate on privilege/incentive levels II and III a one-time only grandfathering opportunity for one year. This means if you are currently receiving periodicals that you did not purchase through the business office, *you may select one, and continue to receive it for no more than 12 months from today's date.* . . .

. . . .

"Please be assured we have reviewed this matter carefully. We appreciate the concerns some of you have raised about the First and Fourteenth Amendment rights you have to reading materials. However, it is important to realize that the department and facility have an overriding interest in the implementation of an effective privileges and incentives program, and these limits on periodicals are crucial to that program. There is no absolute prohibition on periodicals, so we believe this is a proper balancing of everyone's legal interests and objectives.

"Concerning free publications, please be advised if the publication is received **other than by bulk mail**, and you have advised us in advance you are receiving this publication, with verification that it is free, you will continue to receive the periodical. Bulk mail items are not approved, and will not be sent to you by the mailroom.

"Finally, please be advised that we periodically seek input from the inmates about what periodicals they would like us to purchase for the library. This is another option available, and if you have an appropriate periodical you would like to have available in the library, send me a form 9 for review."

In addition to overseeing the mail facility, Phelps also oversaw the operation of inmate libraries. She testified that she received a significant number of requests for publications in response to her March 2 memo and therefore added suggested periodicals to the library. After talking with the librarian and looking over the library lists, Phelps concluded there were library options available that were unused. Based on the information she was receiving, including feedback from inmates and her own observations, Phelps concluded that the library was meeting the needs of the inmates choosing to use it.

An estimated 900 inmates reside in maximum security at LCF. They may access the prison library during two daily periods, one in the morning and one in the afternoon. Six inmates from each of the nine cellhouses are allowed to go during each period, and inmates must choose between using the library and participating in other recreational activities. Inmates must sign up for the library period on a sheet in an open area of the cellhouse. They are not allowed to check out magazines from the library, but are allowed to check out hardback books and some paperback books.

As the Court of Appeals found, in response to inmate complaints, library visitation times were adjusted and inmates were encouraged to request specific publications be added to the library's holdings. The deputy warden stated that a review of actual library use revealed inmate sign-up sheets often were not full. An inmate is permitted to have up to 10 magazines and newspapers of his own in his cell at one time. 31 Kan. App. 2d at 968-69.

Phelps also testified that based upon her historical analysis of IMPP 11-101, she considered it an incentive and privilege regulation. She stated that the relationship between the SPO process and IMPP 11-101 was to provide some incentives for good behavior. According to her, DOC's mission is to try to change behavior, to get inmates to make better decisions, be more accountable, and to think through their decisions. Unfortunately, the gift subscriptions were a very easy way to circumvent the incentives and eliminated the receipt of magazines and newspapers as a privilege to be earned. According to Phelps, one of the things inmates could achieve through the incentive program was using a certain amount of money in a certain way. The $30 limit advances prison security goals, *i.e.*, by reducing a practice called strong-arming. She testified that IMPP 11-101 predominantly concerns the behavior of the offender, but she believes that controlling behavior is always a security issue for the prison.

David McKune, LCF's warden, participated in the development of IMPP 11-101 and testified that the purpose of the regulation was to develop a system that would lead to better inmate behavior and better inmate accountability and responsibility. LCF's desire was to accomplish this through a system of rewards and incentives

rather than a system of negative sanctions. He testified that improved inmate behavior would result in a safer environment for the staff and the other inmates.

William Cummings, LCF's risk manager and the DOC Secretary's designee for review of inmate grievances, testified that one penological objective of the ban on gift subscriptions is to require inmates to meet their financial obligations, such as court fees, restitution for damages, and child support obligations. Cummings further testified about a second penological objective contained in the regulation: security. He stated that the overriding rationale of IMPP 11-101, however, concerns yet another penological objective: to encourage appropriate inmate behavior and good decision-making processes.

Cummings gave one example purporting to touch all three objectives. An inmate engaged in dealing and trading with another inmate, which is prohibited under the inmate rule book. The first inmate had a negative balance in his inmate account of nearly $2,500 for fines, fees, restitution, and postage loans. He therefore arranged for his family and friends to send the second inmate $80 in money orders and gift subscriptions to the Kansas City Star and FHM magazine through that inmate's account, with the apparent agreement that the second inmate would then forward "his" property to him. The second inmate failed to do so, even after demands by the first. The first inmate then made threats toward the second inmate who had failed to carry out his part of the bargain. Cummings testified that if the first inmate's friends and family had sent the $80 directly to the first inmate's account, the prison would have used the money to help pay off the negative balance.

The first inmate's written grievance to the prison administrators stated in relevant part as follows:

" '[S]ince you two cocksuckers love to fuck with me, here's an open invitation. On or about 9/6/01, inmate in B1 received a $10 money order from Oklahoma on my behalf and on 9/7/01 he received $70 from a visitor in South Carolina on my behalf. He also received a Kansas City Star newspaper on my behalf.

". . . As you can see therefrom, the money on his prison account is actually mine. . . . Please seize the $80 on his account before he spends any of it.

". . . I'd rather you cocksuckers seize my family money and confiscate my newspaper and charge me for rule violations than for this sissy to spend a penny of my family's money meant for me or him reading my newspapers and gloating over how he got over on someone again. I am simply another of his many this snake has gotten.

"You should move one of us without any delay. He has a pacemaker and I will do my utmost to cause him great distress and panic attacks. I hope for him to have a heart attack and die, but then if you both refuse to move one of us out of B1 and he does keel over, your deliberate indifference make you equally liable.

"Spare yourselves from interviewing me. Go ahead and take my money and newspaper. I'll deal with him in my own special manner. Excuse me. In my own talented ways. You can return the $80 to my 80-year-old mother or stick it up your asses 50/50, and of course if he spends a penny of this money and you allow it, I'll sue you for not doing your God damn duties."

According to Cummings, since inmates are not allowed to possess currency, they use cigarettes, canteen items, and magazines in a barter system. Debts can be incurred from illegal activities such as gambling, prostitution, extortion, and drugs. He testified that one of the first things LCF authorities tell inmates is to not get into debt. It multiplies, the lender sells the debt to another inmate, and that inmate then attempts to collect. He testified that dealing and trading is probably one of the things that gets inmates into trouble the most.

Roger Bonner, chief investigator at LCF, supervises the Intelligence and Investigations unit, sometimes called the "I and I." He testified that money tracking is a daily part of the investigations process and that dealing and trading constitutes roughly 50 percent of all disciplinary reports at LCF. The "transparency" of inmate transactions, particularly those involving magazines and newspapers, that results from the joint implementation of IMPP 11-101 and K.A.R. 44-12-601 gives investigators an opportunity to verify a complaint. He testified that magazines are third behind cigarettes and electronics in disciplinary reports regarding dealing and trading, constituting 25 to 30% of the cases. Most of the problems in magazine dealing and trading reports concern periodicals of an "adult" nature.

The parties stipulated to the district court that petitioners' family members and friends paid for magazine or newspaper subscrip-

tions in the petitioners' names. These gift subscriptions were sent directly to LCF for delivery by the publisher and addressed to the petitioners. Petitioners did not pay any portion of these gift subscriptions from their inmate accounts and did not present SPO's to LCF's business office in connection with these gift subscriptions. They did not receive delivery of these gift subscriptions at LCF.

The Court of Appeals summarized the respondents' facts and position as follows at 31 Kan. App. 2d at 969:

"Given the library alternative, the ability of Level II and III inmates to spend up to $30 per month to purchase periodicals, the possibility of spending more than that amount for a newspaper every 3 months, and the grandfathering of one gift publication for up to 12 months, the respondents argued that petitioners asserted a 'quite narrow' interest: 'the "right" to receive magazines and newspapers of the inmate's choice, without permitting fiscal transparency.' "

Before this court, respondents further add the ability of an inmate to petition the warden for permission to exceed the $30 limit per month. See IMP 11-101(VI)(B)(2)(d).

On the other hand, testimony from a number of the petitioners revealed the following facts:

Petitioner Kent Vanderveen has a job during the day and participates in arts and crafts in the evening. He has ordered craft items costing $150 during several months. He currently receives USA Today newspaper and the magazines Men's Journal and Smart Money. However, he has never requested permission of the warden to exceed the $30 limit to order books, magazines, or periodicals of any kind.

Vanderveen has seen inmates sign the library list for themselves and a friend, and has seen names scratched off the list and another inmate's name added. Vanderveen estimated that the library lists are filled 90% of the time. The library has magazines and newspapers, but not a wide variety. He testified that the library seems to carry fewer periodicals than it did a year ago. He also testified that pages are often missing from the library's magazines and newspapers.

Petitioner Jerry Rice currently receives Closeout News, the Kansas City Star newspaper, and the magazines Country Music Magazine and Popular Mechanics. He testified that he is allowed to go

to the library during the day shift. In the cellhouse where Rice lives, inmates rotate days based on whether they are in even-or odd-numbered cells. He has observed that the list is always full and he often cannot get on the library list.

Petitioner Calvin Mercer also testified regarding publications he had received before and after the regulations were enforced.

ANALYSIS:

### Standard of Review

Throughout the proceedings on the petitioners' petition filed under K.S.A. 60-901 *et. seq.*, the petition has been treated as one for habeas corpus under K.S.A. 2003 Supp. 60-1501. Petitioners are inmates alleging violations of constitutional rights, a claim that would be proper under 60-1501. See *Anderson v. McKune*, 23 Kan. App. 2d 803, 806-07, 937 P.2d 16, *rev. denied* 262 Kan. 959, *cert. denied* 522 U.S. 958 (1997). Because pro se pleadings are to be liberally construed, we too will consider the petition as if it were one for habeas corpus. See *State v. Andrews*, 228 Kan. 368, 370, 614 P.2d 447 (1980).

The standard of review for a K.S.A. 2003 Supp. 60-1501 petition is whether the factual findings of the district court are supported by substantial competent evidence and whether those findings are sufficient to support its conclusions of law. *Collier v. Nelson*, 25 Kan. App. 2d 582, 584, 966 P.2d 1117, *rev. denied* 266 Kan. 1107 (1998). Substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. 25 Kan. App. 2d at 584-85. Conclusions of law are subject to de novo review. 25 Kan. App. 2d at 585.

As we review the petitioners' allegations, we are also guided by the following considerations.

" '[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' *Price v. Johnston*, 334 U.S. 226, 285[, 92 L Ed. 1356, 68 S. Ct. 1049] (1948). The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives — including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 96 L. Ed. 2d 282, 107 S. Ct. 2400 (1987).

However, convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison. *Bell v. Wolfish*, 441 U.S. 520, 545, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979). "In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 41 L. Ed. 2d 495, 94 S. Ct. 2800 (1974).

Additionally, the Constitution protects the right to receive information and ideas. *Stanley v. Georgia*, 394 U.S. 557, 564, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969). Both the sender and the inmate have fundamental interests in the inmate's access to the information in published material selected for delivery to him. *Woods v. Daggett*, 541 F.2d 237, 240 (10th Cir. 1976); see *Crofton v. Roe*, 170 F.3d 957, 959 (9th Cir. 1999). Here, the communication at issue is between the inmate and the publisher.

Five years ago in *Pool v. McKune*, 267 Kan. 797, 804-05, 987 P.2d 1073 (1999), this court set forth in detail its considerations relevant to the issues in the instant case:

"The standard of review is clearly delineated by the Court in *Turner v. Safley*, 482 U.S. 78, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987). The Court formulated a standard of review for prisoners' constitutional claims that was responsive both to the 'policy of judicial restraint,' 482 U.S. at 85 regarding prisoner complaints and to the protection of constitutional rights. The Court adopted a rational basis test: "'[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.' 482 U.S. at 89.

"In determining the reasonableness of a prison regulation, several factors are relevant: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest; (2) whether the regulation or practice allows inmates an alternative means of exercising the subject constitutional rights; (3) the impact of accommodation of the asserted right on guards, other inmates, and the allocation of resources generally; and (4) the absence of ready alternatives to the regulation or practice. [*Turner*, 482 U.S. at 89-90.]' *Hayes*, 70 F.3d at 1146-47.

"The heart of the *Turner* reasonableness test demands that there be a rational connection between prison action and the legitimate governmental interest put forward to justify it. Thus, the action cannot be sustained where the logical con-

nection between it and the asserted goal is so remote as to render the policy arbitrary or irrational. 482 U.S. at 89-90. . . .

"It is important to point out the reason given by the Court for the adoption of the rational basis test instead of a strict scrutiny test which is generally applied in cases involving a claimed deprivation of a constitutional right. According wide-ranging deference to prison administrators in the adoption and execution of policies relating to prison administration, the Court said:

'In our view, such a standard is necessary if "prison administrators. . ., and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones. v. North Carolina Prisoners' Union*, 433 U.S. [119, 128, 53 L. Ed. 2d 629, 97 S. Ct. 2532 (1977)]. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S. at 407.' 482 U.S. at 89.

"Thus, our evaluation of the constitutional claims in this appeal *must accord great deference to prison administrators in their adoption and execution of policies and practices intended to advance 'valid penological objectives — including deterrence of crime, rehabilitation of prisoners, and institutional security.' O'Lone v. Estate of Shabazz*, 482 U.S. at 348. An inmate's exercise of constitutional rights must exhibit due regard for the concerns of prison administrators. *Hayes v. Marriott*, 70 F.3d at 1146." (Emphasis added.)

As Judge Wahl's dissent pointed out in the instant case before the Court of Appeals, also citing *Turner v. Safley*, 482 U.S. 78, 84-85, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987):

" ' "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." [Citation omitted.] . . . "[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." [Citation omitted.] Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.' 482 U.S. at 84-85." 31 Kan. App. 2d at 974.

In light of the foregoing, we will give "great deference to the prison administrators in their adoption and execution of policies and practices intended to advance 'valid penological objectives' " in this case. *Pool v. McKune,* 267 Kan. at 805. Against this backdrop, we examine the four *Turner* factors in light of the respondents' position in the instant case as stated in their petition for review:

"[1] Removing the correctional facility's involvement in the processing of periodical purchases through the facility inmate banking system by permitting third parties to directly purchase subscriptions from the publisher, creates a barrier between the third party and correctional officials investigating the source and reason for the purchase. [2] Additionally, permitting inmates to have the benefit of items sent to them as a gift when [a] those inmates have lawfully imposed financial obligations in the form of fines, fees, court costs, loans from the state, and restitution; or [b] lack the privilege level to permit their purchasing the periodical [themselves], directly undercuts the motivation on the part of inmates to not incur those obligations, or achieve a higher privilege level.

. . . .

". . . Processing all purchases through the facility inmate account enables correctional officials to apply the Department's system of privileges and incentives, aids in the collection of lawfully imposed financial obligations, provides a tracking mechanism for funds coming into the facility or disbursed from the facility, and tracks items that have been purchased."

## Discussion

*Rationally related to a legitimate and content neutral governmental interest*

The first factor is the rational basis test, *i.e.*, whether the regulation is rationally related to a legitimate governmental interest. Additionally, the governmental objective must be content neutral. *Turner,* 482 U.S. at 89-90.

As noted, respondents presented evidence to the trial court attempting to show that the prison regulations served the government's interests in security and the rehabilitation of inmates. Both are valid penological interests. See *McKune v. Lile,* 536 U.S. 24, 36, 153 L. Ed. 2d 47, 122 S. Ct. 2017 (2002); *O'Lone v. Estate of Shabazz,* 482 U.S. at 348.

The district court found that K.A.R. 44-12-601(q) and IMPP 11-101 were aimed at security and the rehabilitation of inmates, and

that the State showed the regulations were rationally related to rehabilitation:

"The defendants presented evidence that IMPP 11-101's restriction on free [gift] publications was designed in order to have some incentives for people in prisons to behave. The mission of the institution was to try and change behavior. The regulation was designed to try and get people to make better decisions and be more accountable. The defendants presented evidence that the problem with the gift subscriptions was that it was an easy way to circumvent and take the incentives and privileges portion of IMPP 11-101 out of play. The goal of IMPP 11-101 was for inmates to behave and participate in programs and as a result they would be able to use a certain portion of their money in a discretionary way."

By contrast, the Court of Appeals held there was no rational relationship between the ban on gift periodicals and the goals of prison security and inmate rehabilitation. "It is not rational to eliminate all access to all gift periodicals for all inmates, be they model prisoners or habitual disciplinary rule violators." 31 Kan. App. 2d at 973.

We disagree with the Court of Appeals. We have examined the record on appeal, and conclude that substantial competent evidence supports the district court's finding that the regulations are rationally related to the rehabilitation of prisoners. See *Pool v. McKune*, 267 Kan. at 797 (evidence of record also demonstrates that there is a rational connection between plethysmograph testing and the legitimate penological goal of rehabilitation); *Collier v. Nelson*, 25 Kan. App. 2d 582; *cf. Thornburgh v. Abbott*, 490 U.S. 401, 414 n.12, 104 L. Ed. 2d 459, 109 S. Ct. 1874 (1989) (district court stated its standard of review required the Bureau of Prisons to articulate a relationship between its regulations and practices and legitimate penological objectives; Court held that standard was sufficiently close to the *Turner* standard to permit reliance on the district court's findings).

DOC personnel testified that IMPP 11-101 was designed to, among other things, create incentives for inmates to behave, and that gift subscriptions are an easy way to circumvent the outgoing funds restrictions contained there. Additionally, the use of outside funds is but one of several "earnable privileges" contained in IMPP 11-101. Others include audio-visual equipment, handicrafts, par-

ticipation in organizations and formalized activities, canteen expenditures, property, incentive pay, and visitation. IMPP 11-101(I).

Earnable privileges are grouped into four incentive levels for inmates: Intake Level, Level I, Level II, and Level III. While inmates may use up to $30 per month in outside funds, Intake Level inmates are limited to using their outside funds for legal services fees. IMPP 11-101(VI)(A) and (B). Moreover, inmates at Level I may not use those funds to purchase books or subscriptions to newspapers or magazines. IMPP 11-101(VI)(A). Inmates at Levels II and III are not subject to those limitations on use of funds. Additionally, they may maintain one newspaper subscription and may exceed the $30 limit for outgoing funds in order to do so. IMPP 11-101(VI)(D).

To complete Level I — and receive additional earnable privileges such as greater flexibility in use of his outside funds — an inmate must remain free of certain disciplinary convictions, have no pending disciplinary reports, and demonstrate a willingness to participate in recommended programs and work assignments for 120 consecutive days. IMPP 11-101(III)(B)(2). The same requirements hold for completion of Level II and advancement to Level III. IMPP 11-101(III)(D).

In turn, inmates are automatically reduced to Incentive Level I — with its corresponding limitation on use of outside funds and loss of other earnable privileges — for being terminated from a work assignment for cause; for refusing to participate in work assignments or recommended programs; upon conviction of a felony; and for disciplinary convictions for such things as theft, intoxication, drug use, sodomy, arson, assault, battery, sexual activity, relationships with staff, dangerous contraband, disobeying orders, and rioting. IMPP 11-101(IV)(B). Inmates are reduced only one incentive level for two or more disciplinary reports during a single 180-day period which result in a conviction for a class I or class II offense, or any disciplinary conviction not listed in IMPP 11-101(IV)(B) which nevertheless results in a loss of custody or disciplinary segregation. IMPP 11-101(IV)(A).

The district court found that the State's second penological objective of reducing strong-arming, *i.e.,* security, was weak:

"The defendants also maintained that if inmates were allowed to receive gift publications, inmates could strike deals within the prison and demand that friends or family members send books in lieu of cash payments. If the friends of family of an inmate did not comply, the inmate's family or friends could suffer retaliation. This is a practice commonly known as 'strong-arming.' The defendants offered one example of what they believe to be an example of the above problem but even with this the court finds that this argument is weak. The institution allows an inmate to receive a money order or cashiers check to be sent from family or friends. The issue of 'strong-arming' by inmates is just as viable with money being sent in (which is permitted) as it is with free [gift] subscriptions, but the defendants do not restrict the incoming money. The argument that the allowance of free [gift] subscriptions causes a security risk *standing alone* would not be sufficient to withstand the scrutiny of the *Turner* test." (Emphasis added.)

We agree with the district court that strong-arming is not a well-supported argument and that standing alone it is insufficient to withstand *Turner.* Nevertheless, it does add weight to the overall constitutionality of the challenged regulations. Moreover, while the judge did not specify the example he alluded to, we find that Cummings' Kansas City Star example quoted earlier in the opinion is illustrative of several of the problems the LCF officials testified that the regulations attempt to address.

First, this dealing and trading allowed both inmates to circumvent the incentives and privileges system. Second, had the bargain been kept, the transaction would have been completely hidden from the LCF officials who monitored the account of the first inmate, which also would have prevented them from setting off those funds to satisfy his $2,500 debt for fines and postage loans. See, *e.g.,* K.A.R. 44-12-601(o)(3) ("All postage for legal and official mail shall be paid by the inmate . . . . The cost of postage for legal or official mail paid by the facility on behalf of an indigent inmate shall be deducted from the inmate's funds, if available."). Finally, this dealing and trading did indeed create security problems: one inmate openly threatened the other with "my own talented ways" because of the busted deal.

While this example admittedly also demonstrates that most of the same problems occur with money gifts — which are not pro-

hibited — LCF nevertheless has legitimate needs, *e.g.*, security, to track the magazines and newspapers just like it tries to track the money. It accomplishes this by its chosen method of requiring that the inmate himself purchase the periodicals from his own account with an SPO. More important, when the gifted money is deposited in the first inmate's account — per the purpose of the system to provide transaction "transparency" — LCF at least has the ability to set it off against inmate obligations and thus encourage the inmate to instead voluntarily meet his obligations. This encouragement is a form of rehabilitation but is not possible with an inmate who reaps the benefits of gift subscriptions because the money never appears in his account.

Moreover, not even blanket bans are constitutionally prohibited. In *Turner*, the Court upheld on security grounds a regulation which "as practiced [meant] that inmates may not write non-family inmates" throughout the Missouri prison system. 482 U.S. at 82. Similarly, 3 years earlier in *Block v. Rutherford*, 468 U.S. 576, 82 L. Ed. 2d 438, 104 S. Ct. 3227 (1984), the Court upheld a blanket prohibition on contact visits in detention facilities as reasonably related to the security at those facilities, a legitimate governmental objective. In the process, it rejected the Federal District Court and Ninth Circuit Court of Appeals' holding that totally disallowing contact visits was excessive in relation to the security and other interests at stake. 468 U.S. at 587.

"[W]e have emphasized that we are unwilling to substitute our judgment on these difficult and sensitive matters of institutional administration and security for that of 'the persons who are actually charged with and trained in the running,' [441 U.S. at 562], of such facilities. In sum, we conclude that petitioners' blanket prohibition is an entirely reasonable, nonpunitive response to the legitimate security concerns identified, consistent with the Fourteenth Amendment." 468 U.S. at 588.

In the First Amendment context, *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 53 L. Ed. 2d 629, 97 S. Ct. 2532 (1977), is of guidance. There, the Court addressed prison regulations which prohibited inmates from soliciting other inmates to join the North Carolina Prisoners' Labor Union (Union), barred all meetings of the Union, and refused to deliver packets of Union

publications that had been mailed in bulk to several inmates for redistribution among other prisoners. The Union claimed that its rights, and the rights of its members, to engage in protected free speech, association, and assembly activities were being infringed by the no-solicitation and no-meeting rules. 433 U.S. at 122.

*Jones* was summarized by the *Turner* court as follows at 482 U.S. at 86:

"Noting that the lower court in Jones had 'got[ten] off on the wrong foot . . . by not giving appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement,' [433 U.S. at 123], the Court determined that the First and Fourteenth Amendment rights of prisoners were 'barely implicated' by the prohibition on bulk mailings, [433 U.S. at 130], and that the regulation was "reasonable" under the circumstances. The prisoners' constitutional challenge to the union meeting and solicitation restrictions was also rejected, because '[t]he ban on inmate solicitation and group meetings . . . was rationally related to the reasonable, indeed to the central, objectives of prison administration. [433 U.S.] at 129.' "

Similarly, in *Pell v. Procunier*, 417 U.S. 817, 41 L. Ed. 2d 495, 94 S. Ct. 2800 (1974), the Court addressed a prison regulation which prohibited face-to-face interviews between press representatives and individual inmates whom they specifically named and requested to interview. The Court rejected a First Amendment challenge by the inmates (rights of free speech) and by the reporters (freedom of the press). Regarding the inmates' challenge, the Court held:

"Although they would not permit prison officials to prohibit all expression or communication by prison inmates, security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders into the prison for face-to-face contact with inmates.

. . . .

"Accordingly, in light of the alternative channels of communication that are open to prison inmates, we cannot say on the record in this case that this restriction on one manner in which prisoners can communicate with persons outside of prison is unconstitutional." 417 U.S. at 827-28.

In addition to arguing that the Court of Appeals was correct, petitioners in the instant case rely on *Crofton v. Roe*, 170 F.3d 957 (9th Cir. 1999). There, the district court had granted an injunction

barring the enforcement of a Washington prison regulation that prohibited the receipt by a prisoner of any book, magazine, or other publication unless the prison ordered the publication from the publisher and paid for it out of the prisoner's own prison account. The warden had claimed that the policy furthered the interests of preventing contraband from entering the prison, insuring the efficiency of the prison mailroom, limiting fire hazards, complying with space requirements, and preventing "strong-arming."

The Ninth Circuit Court of Appeals found that the State of Washington had failed to show how its goals were furthered by a prohibition on gift subscriptions. The court ruled:

"Here, although the state has had ample opportunity to develop a record, it has offered no justification for a blanket ban on the receipt of all gift publications, nor has it described any particular risk created by prisoners receiving such publications. In sum, the state has shown no rational relationship between the policy and the legitimate penological objectives that it has asserted. Under the First Amendment, this is what the state must do to justify the restriction." 170 F.3d at 960-61.

*Crofton* is distinguishable for two reasons. First, there the State failed to establish a sufficient record that the regulation was rationally related to any penological interest. Second, the penological interest at issue in *Crofton* was security; the court did not reject a blanket ban on gift subscriptions in an incentive program context. Here, DOC also defended its regulations based on the State's interest in inmate rehabilitation — which the district court found was factually demonstrated.

In turn, respondents claim that *Zimmerman v. Simmons*, 260 F. Supp. 2d 1077 (D. Kan. 2003) — decided 6 months after the district court's decision but not addressed by the Court of Appeals — is more persuasive. There, as in the instant case, the defendants claimed that K.A.R. 44-12-601(q)(1) and IMPP 11-101 promoted KDOC's security objective of controlling, managing, and tracking property in the prison, its objective of promoting order through positive inmate behavior, and its objective of ensuring the collection of inmates' other financial obligations. Senior District Judge Van Bebber granted defendants' summary judgment motion and rejected plaintiffs,' concluding that K.A.R. 44-12-601(q)(1) and

IMPP 11-101 are reasonably related to legitimate penological interests and therefore valid. "They promote the internal security of the prisons, help to deter inmates from committing future crimes or rules violations, and aid in inmate rehabilitation." 260 F. Supp. 2d at 1083.

As in the instant case, the *Zimmerman* court distinguished *Crofton* because the *Crofton* defendants had failed to develop a sufficient record to show they had actually experienced any of the problems they described. On the other hand, *Zimmerman's* "[d]efendants . . . developed a sufficient record to show that their regulation and policies are rationally related to legitimate governmental interests. *Crofton* is distinguishable and the court will not rely on it." 260 F. Supp. 2d at 1084. As stated above, we agree that the regulations are rationally related to the prison's legitimate interests in the rehabilitation of inmates and security. The connection is not so remote as to render the policy arbitrary or irrational. See *Turner*, 482 U.S. at 89-90.

Under *Turner*, the regulations must also be content neutral. It is important "to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." 482 U.S. at 90. As explained in *Thornburgh v. Abbott*, 490 U.S. 401, 415, 104 L. Ed. 2d 459, 109 S. Ct. 1874 (1989), "the Court's reference to 'neutrality' in *Turner* was intended to go no further than its requirement in *Martinez* that 'the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.' 416 U.S. at 413."

The district court, while affirming the neutrality of IMPP 11-101, noted that "the regulation is being enforced with uneven application." The court found that although exceptions were made to allow inmates to receive free religious subscriptions and to grandfather one gift subscription, these exceptions were consistent with the respondent's concept of rehabilitation. Similarly, Senior Judge Van Bebber found K.A.R. 44-12-601(q)(1) and IMPP 11-101 to be content neutral. *Zimmerman*, 260 F. Supp. 2d at 1083.

Phelps' memo dated February 20 appears to make an exception for free religious periodicals. Her March 2 memo clarifies that all

free publications, whether religious or not, sent other than by bulk mail will be allowed, as long as the mailroom is notified in advance and the inmate verifies that it is free. Free publications would differ from gift publications in that a free publication would be available to any inmate who requested it. Because all gift subscriptions are treated equally, the regulation is content neutral. It is also important to note that LCF is not totally suppressing any expression, but rather restricting the amount of subscriptions to newspapers and magazines the inmates receive. Within those parameters, the inmates appear to be able to choose freely.

We hold that the regulations are rationally related to the legitimate penological purposes of rehabilitation and, to a lesser extent, security. The majority opinion of the Court of Appeals was incorrect in holding otherwise.

*Alternative means of exercising the right remain*

The "second factor relevant in determining the reasonableness of a prison restriction, as *Pell* shows, is whether there are alternative means of exercising the right that remain open to the inmates." *Turner*, 482 U.S. at 90. "Where 'other avenues' remain available for the exercise of the asserted right, see *Jones v. North Carolina Prisoners' Union*, [433 U.S. at 131], courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.' " 482 U.S. at 90 (quoting *Pell*, 417 U.S. at 827).

Since the Court of Appeals reversed the district court on the first *Turner* factor — "Compliance with the first factor is indispensable as a matter of law to a holding that the ban is reasonably related to legitimate penological interests" — it held that it need not address the remaining three. See 31 Kan. App. 2d at 974.

Respondents suggested several ways that petitioners can have access to the information in these periodicals. First, they claimed the inmates could purchase the subscriptions by having the "gifter" send money for the subscription to the inmate's account so that the inmate can purchase the subscription himself through an SPO. Second, the inmates have available publications in the library. Third, if they reach their limit of $30 per month, they may ask the

warden in accordance with IMP 11-101(VI)(B)(2)(d) to waive that limit. The respondents also argue that they are not totally suppressing anything, but rather restricting the amount of subscriptions to newspapers and magazines the inmates receive. Within those parameters, the inmates generally may choose freely.

Petitioners argue that these alternatives fail because some subscriptions cost more than $30 per month and because some inmates may not have the funds to purchase the subscriptions. They also claim that access to the library publications is not a means of exercising their rights; they contend that inmates have difficulty signing up for library time and that the library lacks the full range of publications they desire.

Petitioners further argue that LCF's stated concerns could be met without a blanket prohibition on gift subscriptions. Specifically, they suggest that the prison could simply limit the number of publications an inmate could receive based on his incentive level. "For example, if an inmate were at the lowest level, perhaps they would be able to receive only one or two gift subscriptions . . . whereas inmates on the upper levels would be able to receive increased gift subscriptions."

The district court found that the prison's first alternative of having inmates purchasing subscriptions was limited because some inmates may not have funds available and because of the $30 monthly limit on spending. The district court found, however, that the inmates' needs were being met through the publications in the library. Additionally, the court found that inmates could petition the warden for an exemption to the $30 spending limit. Accordingly, it found that the respondents have provided alternative methods for the inmates to receive publications, and they were consistent with the legitimate penological interest of rehabilitation that is the focus of IMPP 11-101.

As stated by the district court, there are alternative means for inmates to exercise their First Amendment rights. Inmates at Levels II and III can purchase the magazines and newspapers themselves, up to $30 per month. To make purchases that exceed those limits, inmates may petition the warden for an exemption. Furthermore, all inmates can access magazines and magazines from

the library. Six inmates from each of the nine cellhouses are allowed to sign up for one of two library periods each day, for a total of 108 inmates per day. Although the library does not carry every magazine and newspaper that is published, inmates are encouraged to request that the library carry particular publications, and, according to Phelps, apparently those requested have been added. An in-house review of the actual use of the libraries revealed that often the sign-up sheets for library use were not full.

Substantial competent evidence supports the district court's finding that access to the prison library was a legitimate alternative method consistent with the goals of rehabilitation and security.

As the Supreme Court said in *Thornburgh v. Abbott*, 490 U.S. at 417:

"As has already been made clear in *Turner* and *O'Lone*, 'the right' in question must be viewed sensibly and expansively. The Court in *Turner* did not require that prisoners be afforded other means of communicating with inmates at other institutions, [citation omitted], nor did it in *O'Lone* require that there be alternative means of attending the Jumu'ah religious ceremony [citation omitted]. Rather, it held in *Turner* that it was sufficient if other means of expression (not necessarily other means of communicating with inmates in other prisons) remained available, and in *O'Lone* if prisoners were permitted to participate in other Muslim religious ceremonies. As the regulations at issue in the present case permit a broad range of publications to be sent, received, and read, this factor is clearly satisfied."

### The impact of the accommodation of the right

The third factor under *Turner* requires this court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. "In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." 482 U.S. at 90. If the accommodation of the right would have a significant "ripple effect" on the prison staff or other inmates, this court should be *"particularly deferential to the informed discretion of corrections officials."* (Emphasis added.) 482 U.S. at 90.

Petitioners contend that the only effect of allowing gift subscriptions is that prison officials will have to deliver the magazines that are received as gifts. Respondents argue that this accommodation would negate the incentive for good behavior, as well as the incentive to avoid the imposition of court fees, child support arrearages, and disciplinary fines.

The district court found:

"There is no question that from the institution's viewpoint the limitation/restriction on the receipt of free [gift] subscriptions aids and assists the institution and its employees concerning security issues. The so-called 'strong-arming' issue is reduced. The concern over contraband is reduced. The institution is able to follow the flow of items coming into the institution more carefully. The institution is able to follow the items purchased by the inmate more carefully and to determine whether the inmate is involved in 'trading' of those items."

Substantial competent evidence exists to support these findings. Among other things, if all inmates, regardless of incentive level, were allowed to receive gift subscriptions, it would undermine the incentive and rewards system which serves to rehabilitate the inmates. It would also greatly increase the flow of paper into LCF and the concomitant demands on prison staff to screen and deliver them. If we required the prison to allow gift subscriptions only for Level II and III inmates, it is less clear that the accommodation of the right would have a significant ripple effect, but this does not make the regulation unreasonable. *Turner* speaks of this factor only in terms of giving more deference to the informed discretion of corrections officials if the ripple effect of the accommodation is significant. It does not necessarily follow that if the effect is not significant, the regulation is unreasonable.

*Alternatives to the regulation that have minimum cost to penological interest*

The final factor under *Turner* was stated by that Court as follows:

"Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. [Citation omitted.] By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns. This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional

complaint. [Citation omitted.] But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at a *de minimus* cost to valid penological interests, *a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."* (Emphasis added.) 482 U.S. at 90-91.

Petitioners have suggested that the alternative to the regulation would be to incorporate gift subscriptions into the existing regulations. Respondents contend that no ready alternatives exist to the requirement that subscription purchases be processed through the inmate banking system. The district court did not specifically address this fourth factor in its memorandum decision, though it did borrow language from *Turner* to find that IMPP 11-101 "is not an exaggerated response to the concept of rehabilitation for the inmates."

While the Court of Appeals stated that because the first *Turner* factor had not been met, it would not address the other three, it nevertheless suggested an alternative to the regulations. Specifically, an alternate SPO "could require the ordering friend or family member of the inmate to state the cost of the periodical, the source and manner of payment, and any other data needed for the prison business office and mailroom to perform their monitoring functions." 31 Kan. App. 2d at 973.

Judge Wahl, in his dissent at the Court of Appeals, addressed this fourth *Turner* factor as follows:

"Prison officials do not have to eliminate every conceivable alternative method of accommodating the petitioners' constitutional complaint, but if an inmate can suggest an alternative that accommodates the prisoners' right at minimal cost to valid penological interests, the officials should consider it. Petitioners contend an easy alternative is to incorporate gift subscriptions into the existing prison mail policy. They suggest having the inmates fill out a special purchase order (SPO) for the gift subscriptions, or doing away with the SPO system and simply monitoring incoming publications or allowing inmates access to gift subscriptions as a component of the privilege and incentive policy.

"The first two suggestions clearly impede the goals of rehabilitation and security because they circumvent the prison's incentive based program. The last suggestion to incorporate gift subscriptions into the incentive—based system would appear to be a viable option for consideration.

"However, an evaluation of the constitutional claims under *Turner* must accord great deference to prison administrators in their formulation and execution of

policies and practices relating to prison administration. Such deference is necessary if prison administrators and not the courts are to make the difficult judgments concerning institutional operations. See *Pool,* 267 Kan. at 805." 31 Kan. App. 2d at 977-78.

We agree with Judge Wahl's dissent. We also find substantial competent evidence to support the district court's finding that IMPP 11-101 "is not an exaggerated response to the concept of rehabilitation for the inmates."

We additionally reject the Court of Appeals' suggestion of an "alternate SPO" because it places the burden of additional verification on the prison. Under the present system, inmate purchases can be readily tracked and verified through their LCF bank accounts by item description, number of items, and monetary amount. However, the same cannot be said of alternate SPO's completed and submitted (perhaps untruthfully) by inmates' family and friends over which the prison has no control. This potentially results in necessary verification by the prison for all such gift subscriptions for 900 inmates. It is not the prison's obligation to contact magazine and newspaper publishers or other entities to attempt to verify the accuracy of the information supplied on any "alternate SPO."

We may not necessarily agree that the DOC regulations are the best possible methods to rehabilitate inmates and to secure LCF. The test we use to determine the validity of the regulations, however, is whether they are rationally related to legitimate government interests. In this case, we find that they are.

The opinion of the Court of Appeals is reversed; the opinion of the district court is affirmed.

BEIER, J., not participating.
BRAZIL, S.J., assigned█
DAVIS, J., concurring.