(197 P.3d 843)
No. 99,086

MARCUS B. WASHINGTON, *Appellant*, v. ROGER WERHOLTZ, *et al.*, *Appellees*.

Opinion filed November 26, 2008.

*Marcus Washington*, pro se appellant.

*Libby K. Snider*, special assistant attorney general, for appellees.

Before MCANANY, P.J., BUSER and LEBEN, JJ.

LEBEN, J.: Marcus Washington challenges the constitutionality of a Kansas Department of Corrections regulation that prohibits inmates from possessing sexually explicit materials. After hearing evidence, the district court held that the regulation was constitutional under *Turner v. Safley*, 482 U.S. 78, 89, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987), because it was reasonably related to legitimate interests of the penitentiary. Regulations of this sort elsewhere "have been routinely upheld as rationally related to legitimate penological goals." *Smith v. Dept. of Corrections*, 219 Or. App. 192, 198, 182 P.3d 250 (2008). The evidence before the district court was sufficient to establish that these Kansas prison regulations further legitimate goals of the prison system. We therefore reject Washington's constitutional challenge to the regulations.

*Procedural Background and Standard of Review on Appeal*

Washington brought his claim under the Kansas habeas corpus statute, K.S.A. 60-1501. The claims were presented in a trial at which several witnesses testified. On appeal, we review the district court's factual findings to see whether they are supported by substantial evidence. We review the district court's legal conclusions without any required deference to the district court. *Rice v. State*, 278 Kan. 309, 320, 95 P.3d 994 (2004).

Two other procedural matters bear brief mention. First, the Secretary of Corrections argues on appeal that Washington's claim should be dismissed for failure to exhaust administrative remedies and for failure to file a timely claim in court. We find no merit in that argument. Washington filed specific grievance forms to appeal the withholding of materials kept from him under the regulation. When that grievance was denied, he appealed to the Secretary. When the Secretary denied his claim, Washington filed a claim in court within 30 days. Second, another inmate, Brian McGoldrick, had also appealed the withholding of materials under this regulation; his habeas petition under K.S.A. 60-1501 was tried along with Washington's in a joint trial. But McGoldrick did not appeal, so his claims are not before us.

*The Regulation at Issue*

Before going further, we should set out the regulation at issue, K.A.R. 44-12-313. It was adopted by the Secretary of Corrections under statutory authority to adopt regulations "for the maintenance of good order and discipline" in Kansas prisons. K.S.A. 2007 Supp. 75-5210(f). Washington has not challenged the Secretary's statutory authority to adopt this regulation.

Since 2004, this regulation has provided that inmates may not possess sexually explicit material. The regulation defines that as something containing nudity, very broadly defined, or displaying or describing certain sexual acts:

"(a) No inmate shall have in possession or under control any sexually explicit materials, including drawings, paintings, writing, pictures, items, and devices.

"(b) The material shall be considered sexually explicit if the purpose of the material is sexual arousal or gratification and the material meets either of the following conditions:

(1) Contains nudity, which shall be defined as the depiction or display of any state of undress in which the human genitals, pubic region, buttock, or female breast at a point below the top of the aerola [*sic*] is less than completely and opaquely covered; or

(2) contains any display, actual or simulated, or description of any of the following:

(A) Sexual intercourse or sodomy, including genital-genital, oral-genital, anal-genital, and anal-oral contact, whether between persons of the same or differing gender;  .

(B) masturbation;

(C) bestiality; or

(D) sadomasochistic abuse.

"(c) Each violation of this regulation by inmates classified as sex offenders shall be a class I violation.

"(d) Each violation of this regulation by inmates not classified as sex offenders shall be a class II violation.

"(e) Each violation of this regulation by any inmate if the sexually explicit material depicts, describes, or exploits any child under the age of 18 years shall be a class I offense."

## *The Department's Justification for the Regulation and Its Application of the Regulation to Washington*

The Secretary of Corrections' rationale for banning sexually explicit material was set forth in the written denial of McGoldrick's appeal. The Secretary cited the need to keep these materials away from sex offenders, the negative impact on prison staff, better use of prison resources, and trends in prison management:

"1. In September 2002 the department restricted inmates who are managed as sex offenders from possessing or viewing such publications. Approximately 25% of all inmates are sex offenders. The department could not effectively restrict sex offenders from having access to such materials if other inmates continued to possess . . . them.

"2. There have been complaints from employees about being required to view these materials while performing their duties. There is a potential for staff to file sexual harassment complaints due to exposure to the publications and materials in the workplace environment as well as from comments made by some inmates when making comparisons between individual employees and individuals in the publications or other materials.

"3. An increasing number of correctional agencies nationally have taken this action in order to more efficiently and effectively manage the correctional environment.

"4. The department was expending considerable staff time at several levels to review publications to determine what was allowable and what was not, in processing and deciding appeals from the initial decision, and in processing notifications and other information related to ordering, receiving, or failing to receive such publications. The department will be better able to utilize its resources as a result of this action."

Several books that Washington ordered were censored as sexually explicit: *Slave Girl* by Claire Thompson, *Yearbook Lingerie 2004: Objects of Desire* by Elodie Pivateau, *The Lapdancer* by Juliana Beasley, *How to Make Love Like a Porn Star* by Jenna Jameson, *The Sexual Life of Catherine M.* by Catherine Millet, and *The Bride Stripped Bare* by an anonymous author.

## I. *This Regulation Meets the Tests Set Out in* Turner.

We must analyze the validity of this regulation under the four-part test announced by the United States Supreme Court in *Turner*. The *Turner* Court considered the constitutionality of restrictions on the right of inmates to receive mail and determined that four factors are central in determining the reasonableness of the regulation. 482 U.S. at 89. The four factors are (1) whether a valid and rational connection exists between the regulation and a legitimate governmental interest, (2) whether an alternative means of exercising the constitutional right at issue remains available to inmates, (3) the impact of accommodation of the asserted right upon guards, other inmates, and the allocation of prison resources, and (4) the absence of ready alternatives to the course of action taken in the regulation. 482 U.S. at 89-91; see also *Rice*, 278 Kan. at 321 (citing *Turner* factors); *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004) (same). We will review each factor separately; we will review the relevant factual findings of the district court as we discuss those factors.

## A. *Valid, Rational Connection to Legitimate Governmental Interests.*

We first examine the connection between the regulation and

legitimate government interests. A regulation "is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. In addition, the logical connection between the asserted governmental interest and the regulation must not be "so remote as to render the policy arbitrary or irrational," and "the governmental objective must be a legitimate and neutral one." 482 U.S. at 89-90.

The district court made some specific factual findings that demonstrate a reasonable relationship between the regulation and legitimate prison interests. The court found:

- "[T]here is a significant impact on others by an inmate's receipt of this material," which "negatively affects other inmates (sex offenders), prison personnel and allocation of prison resources."
- "[T]here is a genuine concern for the work environment and the desire to not expose staff to sexual harassment."

These conclusions were supported by evidence presented to the district court, including the written appeal denial that set forth in detail the basis for the regulation.

Keeping sexually explicit materials out of the hands of imprisoned sex offenders is certainly a legitimate interest. One of the inmates testified before the district court that inmates leave materials on tables in the prison, where other inmates pick them up and read them. He also testified that if he were to put such materials into a trash can, other inmates would dig them out. Perhaps a prison could prevent the movement of these materials within a prison, but that would take substantial additional supervision by prison officials. The prison legitimately already tries to keep sexually explicit materials out of the hands of sex offenders with only a moderate degree of supervision.

Preventing the harassment of employees who work in the prison is a legitimate interest too. Other courts have found that this interest is a valid justification for a limitation on sexually explicit materials in the prison. *E.g.*, *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999); *Jolly v. Snyder*, 2003 WL 1697539, at *3 (D. Del. 2003) (unpublished opinion). We agree.

*Turner*'s requirement that the limitation be a neutral one might seem to be a hurdle to this regulation. Surely the regulation is not

content-neutral; some materials are clearly excluded by the regulation based upon their content. In *Hill v. Simmons*, 33 Kan. App. 2d 318, 101 P.3d 1286 (2004), our court considered a similar prison rule keeping sexually explicit materials out of the hands of sex offenders. The *Hill* panel noted that *Turner's* reference to neutrality was intended merely to require that the regulation actually further an important governmental interest, not that it be content-neutral. A similar prison rule in *Hill* met the neutrality test because the prison distinguished between publications not to suppress "the inmate's freedom of expression regarding sexually explicit materials, but on the basis of their potential implications for prison security." 33 Kan. App. 2d at 322-23; see *Thornburgh v. Abbott*, 490 U.S. 401, 415-16, 104 L. Ed. 2d 459, 109 S. Ct. 1874 (1989). Because of the clear relationship between the regulation and valid penological goals, it is neutral for the purpose of the *Turner* test.

B. *Alternative Means to Receive Uncensored Materials.*

We next consider whether an alternative means of exercising First Amendment rights of access to information remains available to the inmates. The district court found that Washington was "permitted to receive a wide variety of publications, as long as they do not contain prohibited materials."

In *Turner*, the Court upheld a limitation on inmate-to-inmate correspondence, noting that the regulation did not "deprive prisoners of all means of expression," but only communication with a limited group—inmates at other prison facilities. 482 U.S. at 92. Here we consider not a limitation on certain types of expression, but one on receipt of certain types of materials. Thus, we look to see whether the prisoner's right of access to information has been eviscerated or whether prisoners still have alternate means to obtain a wide range of materials. As one court put it, "the question is not whether the prisoners have other opportunities to read pornographic materials, but whether they have the opportunity to read in general." *Jolly*, 2003 WL 1697539, at *4. The district court concluded that Kansas inmates are "permitted to receive a wide variety of publications." That finding is supported by the evidence.

C. *The Impact Accommodation of the Prisoner's Right Would Have on Others.*

We turn next to the impact on others that would be expected if the prison were required to accommodate Washington's desire to receive these materials. When there is a significant, negative impact on others, *Turner* counsels that "the choice made by corrections officials—which is, after all, a judgment 'peculiarly within [their] province and professional expertise,' [citation omitted]—should not be lightly set aside by the courts." 482 U.S. at 92-93.

The potentially negative consequences of allowing receipt of these materials by Washington or other inmates are the very factors that demonstrated the State's legitimate interest in censoring these materials. We have already noted the district court's findings that there would be a negative impact on the potential rehabilitation of sex offenders and a potential for harassment of prison employees. Our court is not in a position to second-guess the factual findings of the district court or the judgment of prison administrators on these matters. The district court, not our court, makes the appropriate factual findings from the evidence presented. And prison administrators, not courts, must make the initial judgment call, a decision we must give some degree of deference to under *Turner*. The district court's factual findings were supported by evidence; the judgment call made by prison officials that allowing these materials into the prison would have negative impacts on other inmates and prison staff is supported by that evidence and by common sense.

D. *The Absence of Ready Alternatives to the Approach of the Regulation.*

We turn last to whether there are ready alternatives to the prison regulation. As the *Turner* Court noted, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." 482 U.S. at 90.

The district court found that no easy and workable alternatives were available, in part because a great many resources would be required to implement any alternative:

"Redacting the prohibited material or permitting the inmate's review of the material is not a workable alternative. Considering that the respondents receive mail for thousands of inmates . . . , it would be costly and cumbersome for someone to redact the material from each publication. Additional costs and security would be involved if each inmate was given the right to review the censored material in the presence of staff."

Given the number of inmates and the logical logistical problems, it's easy to see that there are no "obvious, easy alternatives" here.

First, let's consider having prison officials redact the materials to remove only the portions that violate the prison regulation. With thousands of inmates each receiving multiple books or periodicals, a large staff would have to spend all its time reading through the materials, line by line, considering what could be allowed and what had to be removed. *Turner* suggests that if an inmate "can point to an alternative that fully accommodates the prisoner's rights at *de minimus* cost to valid penological interests, a court may consider that as evidence that the regulation" goes too far to pass constitutional muster. 482 U.S. at 91. But the resources that would be required to redact the materials received by Kansas prisoners to conform to the regulation are not *de minimus*.

Second, let's consider an alternative suggestion Washington made in the district court—having the inmates themselves review and redact the materials. That too would obviously require substantial use of prison resources. Some prison staff member would have to make sure that the inmate did not leave the room in which the materials were reviewed with anything that wasn't allowed. At a minimum, that would require searching the prisoner when leaving the room. In addition, prison personnel would still need to review the material page by page or line by line to see whether prohibited material remained in what the prisoner sought to take out of the room for reading and reflection.

Rather than conducting line-by-line reviews of publications, the prison has decided that materials containing some content contrary to the regulation won't be allowed into the prison. Even administering this policy takes substantial staff resources. Between 27 and 30 employees staff the prison mail room; they conduct initial review of incoming materials. Materials flagged by the mail-room staff as

potentially prohibited by the regulation are then reviewed by the prison's publication-review officer. The time already spent by these staff members would be expanded exponentially if they had to review every page of a book or periodical rather than rejecting the item outright once something prohibited was found in it. Washington has not shown that there's an "obvious, easy alternative" to the prison regulation at issue.

II. *Washington's Claim That He Wasn't Told the Name and Address of Each Sender of Censored Mail Has No Merit.*

Washington separately complains that the Department of Corrections did not follow its own regulations by providing him with the name and address of the sender of each item of censored mail. See K.A.R. 44-12-601(d)(2)(B). But the essence of his complaint is that the procedures followed by the Secretary denied him due process, a claim that is fully rebutted by the record of this case.

The essential requirements of due process are notice and the opportunity to be heard in a meaningful manner. *State v. Robinson*, 281 Kan. 538, 548, 132 P.3d 934 (2006). The district court found that Washington suffered no prejudice by the failure to give him the name and address of each sender because Washington already knew that information—he had ordered these materials. Washington had a full and fair hearing of his claims; his attorney had full access at trial to all of the censored material. There was no harm from any failure of the Department to give him this information; thus, there was no denial of due process. See *State v. Brown*, 280 Kan. 65, 77, 118 P.3d 1273 (2005).

## Conclusion

Regulations similar to the Kansas prison ban on sexually explicit materials have been upheld elsewhere against constitutional challenge. *E.g., Mauro*, 188 F.3d 1054; *Amatel v. Reno*, 156 F.3d 192 (D.C. Cir. 1998); *Owen v. Wille*, 117 F.3d 1235 (11th Cir. 1997); *Smith*, 219 Or. App. 192. Indeed, the Kansas federal district court recently upheld the same regulation Washington challenges under the *Turner* criteria. *Strope v. Collins*, 2008 WL 2435560 (D. Kan.

2008) (unpublished opinion). Each of the factors set forth in *Turner* is met here based on the factual findings made by the district court.

The judgment of the district court is affirmed.