**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 21 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JOSEPH E. JACKLOVICH, SR.;
PRISON LEGAL NEWS, INC.; KRIS
ZIMMERMAN,

     Plaintiffs-Appellants,

v.

CHARLES E. SIMMONS, Secretary
of Corrections for the State of
Kansas; WILLIAM L. CUMMINGS,
Secretary Designate, Kansas
Department of Corrections; LOUIS E.
BRUCE, Warden of the Hutchinson
Correctional Facility; PATRICIA
KEEN, OAIV Mail Room Supervisor
of the Hutchinson Correctional
Facility, individually and in their
official capacities,

     Defendants-Appellees.

---

AMERICAN CIVIL LIBERTIES
UNION OF KANSAS AND
WESTERN MISSOURI,

     Amicus Curiae.

Nos. 03-3227, 03-3229, 03-3230

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. Nos. 01-CV-3017-GTV; 02-CV-4054-GTV; 00-CV-3370-GTV)**

Bruce Plenk, (Max Kautsch with him on the brief) Law Office of Bruce Plenk, Lawrence, Kansas, for Plaintiffs-Appellants.

Timothy G. Madden, Senior Counsel to the Secretary, Kansas Department of Corrections, Topeka, Kansas for Defendants-Appellees.

J. Patrick Sullivan, Shook, Hardy & Bacon, L.L.P., Kansas City Missouri, filed an amicus brief for the American Civil Liberties Union of Kansas and Western Missouri, on behalf of Plaintiffs-Appellants.

Before **KELLY** , **HENRY** , and **HARTZ** , Circuit Judges.

**KELLY** , Circuit Judge.

Plaintiffs-Appellants Prison Legal News ("PLN") and Kansas Department of Corrections ("KDOC") inmates Kris Zimmerman and Joseph E. Jacklovich, appeal from the district court's summary judgment in favor of Defendants-Appellees, KDOC corrections officials. The KDOC has promulgated various regulations and policies that (1) provide a $30 per month limit on outgoing inmate funds for books, newspapers and periodicals, subject to exceeding the limit once every three months for a newspaper subscription, (2) require that all inmate purchases of books, newspapers and periodicals be made by special purchase order through the institution, thereby prohibiting gift subscriptions, and (3) provide that books, newspapers and periodicals otherwise received be censored, with notice only to the inmate, but not the sender. Claiming the regulations and

policies unconstitutional, the Plaintiffs sought declaratory and injunctive relief, as well as damages. I R. (03-3229) Doc. 33 at 2; I R. (03-3230) Doc. 53 at 3-4; I R. (03-3227) Doc. 54 at 2. On cross-motions for summary judgment, the district court upheld these regulations and policies against First and Fourteenth Amendment challenges, concluding that they are reasonably related to legitimate penological interests and do not infringe PLN's due process rights. See Zimmerman v. Simmons, 260 F. Supp. 2d 1077, 1084-85 (D. Kan. 2003). Our jurisdiction arises under 28 U.S.C. § 1291 and we reverse.

## Background

Kansas Administrative Regulation § 44-12-601(g)(1) provides that "[a]ll books, newspapers, and periodicals shall be purchased through special purchase orders."[1] I R. Doc. 32, Ex. 1. This regulation essentially requires that all

---

[1] The mail regulation, Kan. Admin. Regs. § 44-12-601, has been amended subsequent to the district court's order. It now provides:

§ 44-12-601 Mail.
. . .
(g) Publications.
(1) Inmates may receive books, newspapers, and periodicals as permitted by the internal management policies and procedures of the department of corrections. All books, newspapers, and periodicals shall be purchased through special purchase orders. Only books, newspapers, and periodicals received directly from a publisher or a vendor shall be accepted. However, an inmate shall be permitted to

(continued...)

3

publications be purchased by inmates through their facility bank accounts, thus

prohibiting the receipt of all gift publications. Inmates are allowed only a facility

bank account; all of an inmate's funds must be deposited therein and transactions

involving any other financial account are only permitted by written permission.[2] I

_____

[1](...continued)
receive printed material, including newspaper and magazine
clippings, if the material is included as part of a first-class letter that
does not exceed one ounce in total weight.

(2) The procedures for censorship of mail listed in subsection (d) of
this regulation shall be used for censorship of publications.

(3) No publication that meets either of the following conditions shall
be allowed into the facility:

(A) Contains sexually explicit material, as described in K.A.R.
44-12-313, or is otherwise illegal, in whole or in part; or
(B) meets, in whole or in part, the test for censorship of mail in
subsection (d) of this regulation.

(4) Inmates shall have the option of having censored publications in
their entirety either mailed out of the facility at their own expense or
discarded.

(5) Before transferring between institutions or facilities, the inmate
shall arrange for a change of address for newspapers and periodicals.
Newspapers and periodicals shall not be forwarded for more than 30
days after the date of transfer.

Kan. Admin. Regs. § 44-12-601 (July 2, 2004); see also Kan. Admin. Regs. § 44-12-601(q) (Feb. 15, 2002) in I R. (03-3229) Doc. 32, Ex. 1. We cite to the current version where comparable provisions exist.

[2] Defendants claim Kan. Admin. Regs. § 44-5-103 as authority for this policy. See I R. Doc. 32, Ex. 8 (Kan. Admin. Regs. § 44-5-103 as amended to

(continued...)

R. Doc. 31 at 4-5, ¶ 16; 1 R. Doc. 34 at 1, item 4.  Any person can mail a money order, certified check or cashier's check to an inmate account.  I R. (03-3229) Doc. 29, attach. 16 at 11.

The regulation barring subscriptions to publications had an effective date of April 17, 1998, but it was not enforced initially; a May 3, 1999, memo gave notice that the policy would be enforced on June 23, 2000, allowing a one-year grandfathering period for inmates to receive newspaper and magazine subscriptions not purchased through a facility bank account.  I R. (03-3229) Doc. 29, attach. 10; I R. (03-3230) Doc. 62 at ¶¶ 9-11, Doc. 53 at 5-6.  Another one-year grandfathering period was allowed for Level II and III inmates until March 2, 2002, for one gift publication of the inmate's choice and for only one year, regardless of the amount of time remaining on the subscription.  I R. (03-3229) Doc. 29, attach. 8.

In addition to the ban on publications not purchased through facility bank accounts, KDOC Internal Management Policy and Procedure ("IMPP") 11-101 limits the amount of an inmate's outgoing funds to $30.00 per month.  Inmates

---

[2](...continued)
May 1, 1984).  This regulation was revoked March 22, 2002.  The parties agree that this is the current policy.  Inmates are barred from establishing a checking or savings account outside the facility bank account without approval.  Kan. Admin. Regs. § 44-12-210.  Inmates also are barred entering into contracts and incurring financial obligations without approval.  Kan. Admin. Regs. § 44-12-209.

assigned to Intake Level and Level I may not use outgoing funds to purchase

books, or newspaper or magazine subscriptions.[3]  Although inmates at Level I

---

[3]  IMPP 11-101 (01-07-02) provides in pertinent part:

**VI.  Limitation on Use of Incoming and Outgoing Funds**
A.  For inmates assigned to Intake Level, outgoing funds shall be limited to fees for legal services, and for inmates on Level I, no outgoing funds may be used to purchase books, or, newspaper or magazine subscriptions.

B.  Except as provided below, there shall be a $30.00 limit on outgoing funds.
    1.  Inmates may exceed the $30.00 limit, if necessary, for the purchase of a primary religious text if the cost of the text is greater than that amount.
    2.  The $30.00 limit shall not apply to payments to the following:
        a.  The court for verified restitution and/or court costs;
        b.  Verified fees payable to an attorney for legal services;
        c.  Verified child support payments;
        d.  Specialized fees, expenses as authorized by the warden or designee; and,
            (1)  As possible, approval for such payments shall be payable to the vendor or service provider only.
        e.  Purchases of approved handicraft materials/supplies.

C.  Upon recommendation of the unit team and approval of the warden or designee, offenders assigned to private industry (minimum wage) or those who receive government benefits may be authorized, on an individual basis, to send out funds in excess of the $30.00 per pay period limit.

D.  Inmates on Incentive Level II or Incentive Level III are authorized to maintain one (1) newspaper subscription, and may exceed the $30.00 limit for outgoing funds in order to do so.
    1.  The expense for the newspaper subscription shall be

(continued...)

6

may have a hot pot, fan, alarm clock, blow dryer, extension cord, curling iron, lamp, ice chest and all consumable post-intake property, they may not have books, magazines or newspapers. I R. (03-3227) Doc. 54, Ex. 24, attach. A to IMPP 11-101. Inmates assigned to Level II and III may purchase books, or newspaper or magazine subscriptions subject to the $30.00 limit. That limit may be exceeded once every three months for the purchase of one newspaper subscription.

Former Kan. Admin. Regs. § 44-12-601(l) (Feb. 15, 2002) provided that "[e]xcept for material ordered through approved special purchase orders, incoming bulk-rate mail shall not be delivered." The current regulation is more specific: "Incoming mail addressed solely to a specific inmate and not otherwise subject to censorship shall be delivered regardless of whether the mail is sent free of charge or at a reduced rate." Kan. Admin. Regs. § 44-12-601(b)(7) (July 2, 2004). In answers to interrogatories, the Defendants stated that inmates may receive free publications, provided that the publications are truly free and do not require the inmate to take affirmative action to cancel a trial subscription. I R. (03-3229) Doc. 32, Ex. 3 at 9. As we understand it, "gift subscriptions" are

---

[3](...continued)
        included in the $30.00 limit.
        2. Such an exception shall be allowed no more than one (1)
        time per every three (3)-month period.

I R. (03-3227) Doc. 54, Ex. 24.

7

subscriptions that are paid for by anyone other than the vendor.  Id. at 10.  To be

"truly free," it must not be possible for an inmate to pay for it.  I R. (03-3230)

Doc. 53, Ex. 20 at ¶ 5.  Kan. Admin. Regs. § 44-12-209 provides that an inmate

may not enter into a contract or incur a financial obligation absent approval.

According to regulation, publications received not in conformity with these

policies are censored.  Kan. Admin. Regs. § 44-12-601(g)(2) & former Kan.

Admin. Regs. § 44-12-601(q)(2) (Feb. 15, 2002).  Inmates are notified in writing

and given the reason for the censorship, and are given the name and address of

the sender if known; it is up to the inmate to contact the sender if he so desires.

Kan. Admin. Regs. § 44-12-601(d)(2).[4]  The author (sender) of the censored item

---

[4]  Kan. Admin. Regs. § 44-12-601(g)(2) invokes the procedures for censorship of mail for censorship of publications.  Those procedures provide:

(d) Censorship grounds and procedures.
 . . .
(2) If any communication to or from an inmate is censored, all of the following requirements shall be met:
(A) Each inmate shall be given written notice of the censorship and the reason for the censorship, without disclosing the censored material.
(B) Each inmate shall be given the name and address of the sender of incoming mail, if known, or the addressee of outgoing mail and the date the item was received in the mail room.  It shall be the responsibility of the inmate to contact the sender of censored incoming mail or the addressee of censored outgoing mail, if the inmate so desires.
(C) The author or the addressee of the censored correspondence shall be given a reasonable opportunity to protest that decision.

(continued...)

8

is given a reasonable opportunity to protest the censorship decision to a different prison official. Kan. Admin. Regs. § 44-12-601(d)(2)(C) & (D).

While acknowledging the mail review process contained in the regulation, an affidavit from Defendant Bruce, the Warden of the Hutchinson Correctional Facility, suggests a different procedure. Seizures of materials sent to Plaintiff Zimmerman were treated "as a property issue alone with the inmate's option within 10 days of notification being whether to send out the material to a designated address or that it be destroyed." I R. (03-3230) Doc. 53, Ex. 19 at ¶ 12. According to the Warden, the procedure in the censorship regulation was not followed because the seizure was not content-based and, if the regulation was followed, the material would have to be held for 45 days during the appeals process, rather than 10 days, causing serious storage and fire concerns. Id.

Plaintiff KDOC inmates proceed under 42 U.S.C. § 1983, alleging that Defendant corrections officials have deprived them of their First Amendment rights by refusing to deliver to them numerous publications (including more than one newspaper and several magazines) not purchased with a special purchase

---

[4](...continued)
(D) All protests shall be referred to a prison official other than the person who originally disapproved the correspondence.

Kan. Admin. Regs. § 44-12-601(d)(2); see also former Kan. Admin. Regs. § 44-12-601(k)(1)-(4) (Feb. 15, 2002).

order, including gift subscriptions. Included among those publications is Prison Legal News, paid for by friends and family outside of the prison. Plaintiffs claim their rights are further infringed by the limits on the amount of money that may be spent each month on publications, as well as by the limit of one newspaper subscription.[5]

Plaintiff Prison Legal News, Inc. is a non-profit publisher of Prison Legal News, a monthly magazine that focuses on prison issues. Although friends and family of KDOC inmates have paid for subscriptions to Prison Legal News for certain inmates, corrections officials have refused to deliver the publications. In addition, corrections officials do not notify PLN when a publication is not delivered. PLN contends that the refusal to allow inmates to receive publications unless purchased from a facility bank account, the $30.00 limit, the limit on the number of subscriptions, and the complete ban on publications for Level I inmates violates its First Amendment right to communicate with inmates. I R. Doc. 1 at 7; Doc. 33 at 5. PLN also complains that the prison policies deprive it of due

---

[5] Plaintiff Jacklovich also claimed that the Defendants conspired to violate his constitutional rights and violated his due process rights when he complained about the seizure of publications. The district court determined that the conspiracy claim could not proceed absent a violation of a constitutional right, and that the due process claim lacked any evidentiary basis. Zimmerman, 260 F. Supp. 2d at 1085. Given the district court's rationale on the conspiracy claim, we remand for reconsideration in light of our disposition. The due process claim has not been raised on appeal and therefore is deemed abandoned.

10

process because it is never notified of non-delivery, given a reason for the non-delivery, and/or given an opportunity to contest it. I R. Doc. 1 at 8.

Defendants advance two rationales for the policies--security and behavior management. First, they contend that the ban on gift publications allows the facility to monitor and regulate all inmate financial transactions, and control the property entering the facility. This monitoring allows them to be better able to detect financial transactions that violate prison rules and regulations or state law, such as theft, drug dealing, debt adjustment, as well as entering into contracts without authorization and obtaining property by false pretenses. In particular, Defendants seek to prevent the practice of strong-arming, where one inmate coerces another to arrange for a gift subscription to be purchased by someone on the outside. Second, Defendants submit that the policies provide incentives for good behavior and better citizenship by inmates, including paying restitution, child support, court filing fees and other outstanding financial obligations.

Discussion

On cross-motions for summary judgment, our review of the summary judgment record is de novo and we must view the inferences to be drawn from affidavits, attached exhibits and depositions in the light most favorable to the party that did not prevail, here the Plaintiffs. See United States v. Diebold, Inc.,

11

369 U.S. 654, 655 (1962). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Resolution of the inmates' claims requires balancing between the constitutional rights retained by inmates and those who send them publications against the deference owed to prison authorities when it comes to prison administration. Turner v. Safley, 482 U.S. 78, 84-85 (1987). Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison. Pell v. Procunier, 417 U.S. 817, 822 (1974); Clement v. Cal. Dep't of Corrs., 364 F.3d 1148, 1151 (9th Cir. 2004). In weighing the First Amendment interests against the deference afforded corrections officials, the reasonableness of the regulations and policies matters. Thornburgh v. Abbott, 490 U.S. 401, 414 (1989). Although the Court has continually recognized (1) the difficulty of running a prison, (2) the separation of powers concerns when a federal court assumes a function (prison administration) entrusted to the legislative and executive branches, and (3) the need for federal courts to accord deference to state prison authorities, Turner, 482 U.S. at 84-85, those factors do not mean that

12

every prison regulation is insulated from review no matter what the facts may be. As the Court stated in Procunier v. Martinez, 416 U.S. 396 (1974), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401 (1989):

> But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.

Procunier, 416 U.S. at 405-06.

The Court has determined that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. The four-factor test supplied by the Court requires a look at (1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest, (2) whether alternative means of exercising the constitutional right remain available to inmates, (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of ready alternatives. Id. at 89-90.

A. Restricting Publications

The district court approved the $30 monthly limit on publications, the ban on gift publications, and the ban on Level I inmates obtaining publications altogether. Zimmerman, 260 F. Supp. 2d at 1083. Indeed, Defendants argue that a key justification for the ban on gift publications is to enforce the $30 monthly

13

limit. Concerning the first factor, the district court held that the regulations and policies were rationally related to legitimate governmental interests. Id. The district court determined that the regulations and policies promote internal security, act as a deterrent on future crimes or rules violations, assist in inmate rehabilitation, and are content neutral. Id. The district court concluded that it need not consider the three remaining Turner factors. It then stated without analysis that after reviewing the evidence and the arguments, none of the three factors weighed in the Plaintiffs' favor. Id. at 1084-85. With regard to PLN's due process claims based upon lack of notice of non-delivery, the district court held that notification to the inmate alone satisfied PLN's due process rights. Id. at 1086. The district court concluded that because the ban on delivery of gift publications was not based upon content, but applied to all gift publications and to Level I inmates, it was a purely procedural decision not requiring notice to the publisher. Id.

The district court erred in not considering the remaining three Turner factors in the context of summary judgment. Zimmerman, 260 F. Supp. 2d at 1084-85. With regard to the district court's conclusion that it was unnecessary, we disagree. The district court first cited Morrison v. Hall, 261 F.3d 896, 901, 904 (9th Cir. 2001), in support of its position, but that case is readily distinguishable–the court held the first factor dispositive only if no rational

14

relationship exists between the regulation and a legitimate state interest. No rational relationship existed between a prison regulation banning incoming mail based upon postage rate (the regulation banned bulk, third and fourth class mail) and legitimate penological objectives. Id. at 904. Thus, there was theoretically no need to consider the remaining factors.

The district court also relied upon Scott v. Mississippi Dep't of Corr., 961 F.2d 77 (5th Cir. 1992), stating that a "district court did not err in failing to articulate a consideration of each of these factors." Id. at 81. In Scott, the district court held that a prison regulation requiring short hair was reasonably related to legitimate penological objectives without addressing the remaining Turner factors. The court of appeals prefaced its discussion with the observation that a court is not required to "weigh evenly, or even consider," the remaining factors. Id. We think that the analysis used by the court of appeals belies its statement–the court considered the remaining factors before declaring that summary judgment was appropriate. Id. at 81-82. Even when a court finds the first factor weighs in favor of finding the regulation constitutional, it should still consider all four factors. See Beerheide v. Suthers, 286 F.3d 1179, 1185-87 (10th Cir. 2002) (rejecting a prison policy against providing Kosher diets after consideration of all four factors, even though it found the first factor weighed in favor of finding the policy constitutional).

15

The district court then "reviewed the evidence and the arguments with respect to these final three factors and conclude[d] that none of the factors weigh in Plaintiffs' favor." Zimmerman, 260 F. Supp. at 1084-85. It is not clear what standard the district court used; our de novo review of the record persuades us that there are genuine issues of material fact on these factors, as well as the first factor, in the context of the challenges made in this case.

1. Resolving This Case as a Matter of Law on the Basis of Similar Cases

Defendants have brought to our attention Rice v. Kansas, 95 P.3d 994 (Kan. 2004), as supplemental authority, which affirmed a state trial court judgment upholding the ban on gift subscriptions and the spending limitations on publications. The Kansas Supreme Court reversed the Kansas Court of Appeals. Rice v. Kansas, 76 P.3d 1048, 1054 (Kan. Ct. App. 2003) (holding that the ban on gift subscriptions was not rationally related to the legitimate penological interests of security and inmate rehabilitation), rev'd 95 P.3d 994 (Kan. 2004). Rice did not consider the lack of publisher notification when a subscription is rejected. Equally important, Rice involved a trial to the court complete with testimony of witnesses and exhibits, not summary judgment. It did not include the expert testimony in this case. The Kansas Supreme Court reviewed the factual findings of the state trial court for support by substantial competent evidence and then whether findings supported the legal conclusions. Rice, 95 P.3d at 1002. On

16

summary judgment, we must view the evidence and inferences therefrom in the light most favorable to the party that did not prevail–we may not resolve credibility disputes. Rice does not control the outcome of this case.

Plaintiffs urge us to follow Crofton v. Rowe, 170 F.3d 957 (9th Cir. 1999), where the panel affirmed an injunction prohibiting enforcement of a regulation that banned gift subscriptions, and only allowed publications ordered by an inmate through his facility bank account. The court rejected the strong-arming rationale offered by the warden as unsupported by any evidence. Crofton, 170 F.3d at 960. The court also recognized that the warden's argument was undercut by allowing friends and family to send money to inmates, but not constitutionally protected publications. Id. Crofton is distinguishable because it addressed only the strong-arming rationale, not the behavior management rationale. The district court in this case also distinguished Crofton on the basis that uncontroverted evidence of an incident of strong-arming had been offered, as well as the difficulty of tracing the source of gift subscriptions. Zimmerman, 260 F. Supp. 2d at 1084. As we discuss below, the Plaintiffs raised serious questions about the admissibility of the materials in this record to establish the incident, and it is doubtful that those materials on their face are sufficient to justify the policy. Moreover, concerning the difficulty of identifying who paid for a subscription, the evidence in the record is not adequately developed and does not address

17

reasonable alternatives where the Defendants would be assisted in such identification by the donor.

2. <u>Genuine Issues of Material Fact-Turner Factors</u>

We briefly review some of the evidence which precludes summary judgment on the $30 monthly limit on publications, the ban on gift publications, and the ban on Level I inmates obtaining publications. Plaintiff's expert, Patrick McManus, a former Secretary of the Kansas Department of Corrections with an extensive background in corrections, was of the opinion that the policies limiting access to publications serve no legitimate penological purpose (and may undermine rehabilitation), result in greater work for prison staff, are unique among jurisdictions and are unsupported by any empirical data. I R. (03-3229) Doc. 29, Ex. 15; Doc. 39, attach. 15A; <u>see also</u> <u>Clement v. Cal. Dep't of Corr.</u>, 220 F. Supp. 2d 1098, 1110 (N.D. Cal. 2002) (discussing rehabilitative benefits associated with inmate reading and contact with the outside world), <u>aff'd</u> 364 F.3d 1148 (9th Cir. 2004); <u>Knecht v. Collins</u>, 903 F. Supp. 1193, 1200 (S.D. Ohio 1995) (same). Defendants sought to minimize the import of this opinion, claiming that the expert actually supports the use of incentives. I R. (03-3229) Doc. 36 at 5, ¶ D; Doc. 37, Ex. 3 at 81. Even given the deference paid to corrections officials in these matters, we are reluctant to conclude that as a matter

of law the expert's opinions require summary judgment for either party.[6]  To be

sure, the expert was vigorously cross-examined, and a trier of fact is free to

evaluate the proper weight to be given expert's testimony.  But that is not the

function of summary judgment.

Beginning with the behavior management rationale, Defendants correctly

point out that the plurality in McKune v. Lile, 536 U.S. 24, 39 (2002), stated that

"An essential tool of prison administration . . . is the authority to offer inmates

various incentives to behave."  The plurality was addressing whether a demotion

(for non-participation in a sexual abuse treatment program) from Level III to

Level I, with its attendant loss of privileges (loss of publications was not

mentioned), could constitute compulsion for Fifth Amendment purposes.  This

statement does not equate with an endorsement of every aspect of the privilege

and incentive system; review under the Turner factors is still appropriate.  See

Wares v. Simmons, No. 04-3150, slip op. at 4-5 (10th Cir. Dec. 14, 2004)

(distinguishing McKune as applicable to prison restrictions challenged under the

---

[6]  Plaintiffs suggest that the $30 limit on publications cannot be justified as a means of behavior management because it is not graduated–Level I inmates can make no purchases, and Level II and III inmates are limited to the same $30 amount regardless of difference in status attained.  They also contend that the $30 limit was set in 1996; and it unduly restricts inmate access to constitutionally protected materials if the ban on gift publications stands.  Because we are remanding on related issues, the district court should consider these arguments in light of the evidence.  The summary judgment record does not warrant judgment for either party at this point.

19

Fifth Amendment and then addressing Turner factors).

There are two aspects of the behavior management rationale that are unsupported and should be explored on remand. First, the Level I complete ban on publications (other than a primary religious text) for inmates promoted from Intake status to Level I for the minimum 120 days appears to be a function of status, not behavior. II R. (03-3230) Doc. 67, attach. 6 (IMPP 11-101, III(B)(2) (05/07/2001)). We fail to see how a four-month complete denial of access to constitutionally protected materials (regardless of behavior) furthers behavior management or rehabilitation.

Second, regarding the $30 monthly limitation on expenditures, though subject to various exceptions, the evidence in the record simply does not make an adequate link between the limitation on expenditures and increased payment of restitution, child support or court filing fees by inmates. Stated another way, if inmates are required to meet such obligations before discretionary expenditures, the $30 limitation would not appear to be a factor. See I R. (03-3229) Doc. 32, Ex. 3 at 10. Moreover, the amount of the limitation in relation to the limitations on canteen expenditures ($180 for Level III inmates) is not apparent in light of the claimed rehabilitation or restitution interest. See Id. To be sure, limits on the number of subscriptions due to space limitations, safety concerns or processing constraints might be appropriate, but that is not how the regulations have been

defended and such concerns may be handled through more precise regulation.  See

Crofton, 170 F.3d at 960.

Concerning the security rationale, a consistent theme of the Defendants pleadings is that any property in a correctional facility can become a medium of exchange so all property should be treated alike; regardless of its expressive content.  Most property is treated alike, however, the Defendants have submitted evidence of a policy that allows free and religious[7] publications by subscription, and a primary religious text.  I R. (03-3229) Doc. 29, Ex. 16 at 10-11.  The district court determined that the extent of such a policy was controverted, but viewing the evidence in the light most favorable to the Plaintiffs, assumed that it did not exist.  Zimmerman, 260 F. Supp. 2d at 1081 n.1.  Such a policy cuts both ways; for our purposes, it suggests inconsistency (perhaps content-based) and on remand the nature and extent of such a policy should be determined as a factual matter.

Though stated many ways, the prevention of strong-arming is the central concern of the security rationale.  Defendants rely heavily on one example involving a Level I inmate who has been transferred to another state.  In an

---

[7] Perhaps this possible inconsistency concerning religious publications is motivated by the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5.  We have yet to pass on the constitutionality of RLUIPA.  See Hammons v. Saffle, 348 F.3d 1250, 1258 n.3 (10th Cir. 2003).

affidavit, a corrections manager reported on a grievance he received from the inmate:

> Inmate Lynn through grievances contends that he conspired with others to have magazine subscriptions paid for by his family members but sent to another inmate by the publisher. Additional[ly], he contends that money was also sent to the same inmate who was to in turn deliver the magazines and items purchased from the canteen to inmate Lynn. Subsequently, inmate Lynn complained that he was double crossed by the other inmate and that he did not receive the publications and that the other inmate [spent the] money for the other inmate's own benefit. Inmate Lynn in his grievances threatened the other inmate.

I R. (03-3229) Doc. 32, Ex. 2. Plaintiffs rightly point out that much of this is hearsay, and of questionable veracity given the author of the grievance. They contend that none of it has been substantiated. One vehicle can only carry so much baggage, and we think that were this reduced to admissible evidence in a trial, it is subject to interpretation. Viewing it in the light most favorable to the Plaintiffs, it points out that there is no limitation on outside funds that may be deposited into an inmate's facility account. As we learned at oral argument, the maximum expenditure for inmate purchases is $180 per month for Level III inmates and $110 for Level II inmates, but expenditures for purchases from other than the facility canteen are limited to $30 per month. I R. (03-3229) Doc. 10 at 3, ¶ 8; Doc. 32, Ex. 3 at 11. The $30 limit includes publications and magazine subscriptions, with an exception for a newspaper subscription. Plaintiff's expert indicated that it was far more likely that strong-arming would occur with items

22

purchased from the canteen such as goods or consumables, as opposed to magazine subscriptions. I R. (03-3229) Doc. 29, attach. 15 at 89-90. Indeed, the prison policy would seem to permit acquisition of large items (televisions) without such restrictions, provided that an inmate had the funds in his account, and notwithstanding that there has been dealing and trading in such items. I R. (03-3229) Doc. 29, attach. 16 at 48, 186.

Defendants suggest that permitting unlimited funds to be sent to an inmate's account from the outside, but not permitting subscriptions, is entirely rational. They rely upon an affidavit from a prison intelligence and investigation official who states:

> I have contacted magazine publishers in an attempt to find out who has paid for a subscription for magazines being sent to an inmate, but have been told by the publisher that the information is not available. In contrast, I found that useful investigative information can be gathered through investigations pertaining to the purchase of money orders.

I R. (03-3229) Doc. 32, Ex. 6 at 3. While this may be true in the abstract, neither affidavit applies this rationale to the primary example relied upon by Defendants. It does seem odd that a money order, certified check or cashier's check will be accepted without the donor's name if strong-arming is a problem. See I R. (03-3229) Doc. 29, attach. 16 at 11. Although Defendants need only prove a rational connection between the policy prohibiting gift publications and the risk, findings by the district court will better allow for consideration of this rationale. The state

23

courts that have reviewed the strong-arming rationale have found it "weak" and "not a well-supported argument," insufficient to withstand the <u>Turner</u> factors independently. <u>Rice</u>, 95 P.3d 994, 1006 (Kan. 2004).

3. <u>The Remaining Turner Factors</u>

a. <u>Alternative Means to Exercise the Right</u>

There are also factual disputes concerning the remaining three <u>Turner</u> factors that will require the taking of evidence. Concerning the inmates' other alternative means to exercise their First Amendment rights, we agree that the ability to listen to the radio or watch television is not an adequate substitute for reading newspapers and magazines. <u>Morrison v. Hall</u>, 261 F.3d 896, 904 (9th Cir. 2001); <u>Mann v. Smith</u>, 796 F.2d 79, 83 (5th Cir. 1986). The issue here is whether the regulations and policies here still "permit a broad range of publications to be sent, received, and read." <u>Thornburgh</u>, 490 U.S. at 418. The cost of subscriptions–many exceed $30 per year–may foreclose inmate access absent a family member or friend purchasing it. I R. (03-3229) Doc. 29, Ex. 16 at 74-76. Defendants contend that it is not onerous to require family members and friends to send money to the inmate whereupon the inmate can purchase a subscription. Aplee. Br. at 26 ("This is the same procedure that is used if a friend or family member wishes to purchase a television or any other item for an inmate."). This

24

does not address the $30 limitation on subscriptions, and it is unclear from where this amount originates.

Defendants submitted an affidavit by a deputy warden concerning measures taken to increase library access by inmates; however, the efficacy of those measures was controverted. Compare I R. (03-3229) Doc. 37, Ex. 1 with Doc. 29, Ex. 16 at 42-47, 49-50, 73-74. Plaintiffs provided evidence of limited times and limited selections, as well as missing pages and titles. Certainly a reasonable inference from this record is that Prison Legal News is not available. I R. (03-3229) Doc. 29, attach. 15 (inmate affidavits concerning non-receipt of PLN).

b. Effect of Accommodation

Defendants argue that accommodating gift subscriptions would interfere with their efforts at behavior modification because inmates might still violate rules yet receive publications. They also maintain that having all transactions occur through facility bank accounts deters strong-arming. In this regard, they assert that an inmate that is the victim of strong-arming (involving cash sent to a perpetrator's facility bank account) will more likely report it to authorities because the perpetrator will not know if corrections officials acted based upon a tip or upon a routine review of facility bank accounts. Finally, they argue that ordering publications directly from the vendor reduces processing and disposition costs because eligibility for the publication is already determined. Regardless, it

25

appears that all incoming mail is opened. I R. (03-3229) Doc. 29, attach. 16 at 11.

Plaintiffs contend that the strong-arming rationale vis-a-vis constitutionally protected publications pales in comparison to that in connection with items from the canteen or items from the outside like radios or televisions. I R. (03-3229) Doc. 29 at 17, attach. 13 at 90; attach 16 at 186. They also point out that the institution currently receives free publications, authorized publications subject to the $30 limitation, and gift subscriptions to inmates that are not delivered. I R. (03-3229) Doc. 29 at 17. They contend that merely delivering the gift subscriptions would have minimal effect. Likewise, they contend that the current $30 limitation could be raised with minimal effect. The current policy represents a change from the unrestricted policy in effect before; on remand there ought to be an evidentiary basis for the claims made by either party.

Also relevant, other institutions apparently permit receipt of gift publications, including the Federal Bureau of Prisons, Washington and Alabama. See 28 C.F.R. § 540.70 ("[T]he Bureau of Prisons permits an inmate to subscribe to or receive publications without prior approval, and has established procedures to determine if an incoming publication is detrimental to the security, discipline, or good order of the institution or if it might facilitate criminal activity."); Sorrels v. McKee, 290 F.3d 965, 968 n.2 (9th Cir. 2002) (Washington); I R. (03-3229)

26

Doc. 29, attach.13 (Alabama). Though certainly not dispositive, these policies may be considered. See Martinez, 416 U.S. at 414 n.14.

c. Absence of Ready Alternatives

The final factor to be considered is the absence of ready alternatives. Ready alternatives may suggest an exaggerated response to a problem. Defendants maintain that only by allowing purchases through the facility banking system may they adequately prevent strong-arming and circumvention of property restrictions attendant to the behavior modification program. Plaintiffs contend that a special purchase order ("SPO") could be developed for subscriptions whereby the donor would state the cost of the publication, the source and manner of payment, and any other necessary information. Aplt. Br. at 10.

The Kansas Supreme Court appears to have rejected this alternative as a matter of law concluding that every SPO would require burdensome independent verification by the prison. Rice, 95 P.3d at 1012. It appears that the cash received by inmates through their facility accounts would implicate the same concerns on a larger scale. Be that as it may, the evidentiary basis in our summary judgment record indicates that KDOC maintains a database allowing it to check every publication entering the facility. I R. Doc. 53, Ex. 20 at ¶¶ 3-4 (affidavit of Defendant Patricia Keen, Mailroom Supervisor). If the publication is unsupported by an SPO, the inmate is advised through a form that he has 10 days

27

to indicate whether the item is to be destroyed or forwarded at his expense.  Id. at ¶ 4.  As the record in Mr. Zimmerman's case makes clear, a facility already expends significant time and effort determining whether publications are truly "free."  On remand, the district court should consider ready alternatives.

B.  Notification Provisions

As noted, the current censorship policies give notice to an inmate that a publication will not be delivered, but they do not provide any notice to the sender. The district court acknowledged that minimum procedural safeguards must accompany any decision to withhold delivery or censor incoming prison mail. Zimmerman, 260 F. Supp. 2d at 1086.  It then concluded, however, that since the decision to withhold delivery was not content based, but applied to Level I inmates and recipients of gift subscriptions, notification of the inmate was sufficient to protect PLN's due process rights.

In Procunier v. Martinez, 416 U.S. at 418, the Court recognized that both inmates and correspondents have a qualified liberty interest in uncensored communications that are protected by the First Amendment.  The Court required "minimum procedural safeguards" and affirmed a district court  requirement "that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of the letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person

28

who originally disapproved the correspondence." Id.

Thornburgh v. Abbot, 490 U.S. 401, 413-14, overruled Martinez in part and imposed the Turner reasonableness standard on regulations concerning all correspondence. However, nothing suggests that the qualified liberty interest recognized in Martinez was overruled. Indeed, Thornburgh involved a challenge to the Bureau of Prisons censorship and the court commented that "[t]he regulations provide procedural safeguards for both the recipient and the sender." 490 U.S. at 406. The Court cited the regulation requiring the Bureau of Prisons to provide a copy of the rejection letter notifying the inmate to the publisher, 28 C.F.R. § 540.71(e). Thornburgh, 490 U.S. at 406. Were there any doubt, the Court stated that "there is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." Id. at 408.

Other courts have recognized that both inmates and publishers have a right to procedural due process when publications are rejected. See Prison Legal News v. Cook, 238 F.3d 1145, 1152-53 (9th Cir. 2001); Montcalm Publ'g Co. v. Beck, 80 F.3d 105, 109 (4th Cir. 1996). In Montcalm, the Fourth Circuit considered the lack of notice afforded the publisher of a disapproved magazine sent to an inmate. The court held "that publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate-subscribers."

29

80 F.3d at 106. We agree.

Defendants suggest that its lack of notification is reasonable, arguing that the cost to the state outweighs any interest the publisher may have. Defendants argue that publishers would have no interest in pursuing administrative appeals based on an inmate's Level I status, particularly where an inmate had not contacted the publisher pursuant to the notification given the inmate. Aplee. Br. at 29. The record suggests that the more common reason for rejection would be the lack of an SPO associated with the publication.

Defendants cite to no evidence concerning cost to the state. We agree with the Fourth Circuit that the publisher's rights must not be dependent on notifying the inmate (who in all likelihood will never see the publication). Montcalm, 80 F.3d at 109. Given the Defendants' approach, the publisher may never know (or know well after the fact) that the publication has been rejected by the facility. Defendants presuppose that any challenge will be meritless; the record contains one failure to deliver where the inmate was able to prove that he attempted to pay for a subscription, and thus was allowed to have it. I R. (03-3230) Doc. 53, Ex. 15. We further agree that providing adequate individualized notice to the publisher would appear to impose a minimal burden. Id.; see also I R. (03-3230) Doc. 53 at 6 ¶ 5 (form has been developed to notify inmates of seizure of materials). On remand, the district court may fashion an appropriate procedure.

The district court may consider any changed circumstances in imposing a remedy.

**REVERSED**.